## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES FOR THE USE OF COLORADO CUSTOM ROCK CORP., <br><br> Plaintiff, <br><br> v. <br><br> G&C FAB-CON, LLC, et al., <br><br> Defendants. | Civil Action No. 20-2968 (GC) (RLS) <br><br><br> **MEMORANDUM OPINION AND ORDER** |

**SINGH, United States Magistrate Judge.**

**THIS MATTER** comes before the Court upon the Motion of Plaintiff United States for the Use of Colorado Custom Rock Corp. ("CCR") for Sanctions for Spoliation of Evidence (the "Motion"). (Dkt. No. 45). Defendants G&C Fab-Con, LLC ("G&C") and Everest Reinsurance Company ("Everest") (collectively, "Defendants") oppose the Motion, (Dkt. No. 47), to which CCR replied, (Dkt. No. 48). The Court has considered the parties' submissions and oral arguments of counsel during the February 28, 2023 hearing. For the reasons set forth herein, and for other good cause shown, Plaintiff's Motion is hereby **GRANTED** in part and **DENIED** in part.[1]

## I.    BACKGROUND

This suit arises out of an expansion and construction project located at Pike's Peak National Cemetery in Colorado Springs, Colorado (the "Project"), which was owned by the United States Department of Veteran's Affairs (the "VA"). (Dkt. No. 22 at p. 7 ¶ 5).[2] To complete the Project,

---

[1] Magistrate Judges may issue written orders on non-dispositive matters, including evidentiary rulings, pretrial discovery matters, and the imposition of sanctions. *See, e.g.*, *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 517-18 (D.N.J. Jan. 3, 2008).

[2] All citations to page numbers herein refer to those automatically generated by the electronically filing system (PACER).

the VA retained G&C as the general contractor, and, in early January 2018, G&C engaged CCR as a sub-contractor to perform masonry and other construction work as detailed in a subcontract, which, in relevant part, included masonry work on an administration building and a maintenance building. (*See* Dkt. No. 1 at ¶ 7). Everest provided payment and performance bonds pursuant to 40 U.S.C. § 3133 *et seq.* (the "Bonds"). (Dkt. No. 1 at ¶ 8).

As construction proceeded, there were delays in CCR's performance, and the parties' relationship began to deteriorate. (*See* Dkt. No. 22 at p. 8 ¶ 7; *see also* Dkt. Nos. 45-3 at p. 65, 47-2 (letters from G&C to CCR regarding concerns over its workmanship and delays)). Relevant to the instant Motion, on April 4, 2019, VA representatives informed G&C of their observation that the masonry wall on a side of the maintenance building "was not plumb[,]"[3] leading to further investigation into the integrity of the maintenance building's walls, which were being constructed by CCR. (*See* Dkt. No. 45-3 at pp. 80-81; Dkt. No. 47-6). Over the following weeks, CCR and G&C, through its third-party surveyors, conducted "tolerance checks" and surveys of the maintenance building's walls to see if the walls met the Project specifications for plumbness.[4] (*See* Dkt. No. 45-3 at pp. 25-30, 80-81; Dkt. No. 45-4 at pp. 39-56; Dkt. No. 45-5 at pp. 54-71; Dkt. No. 47-6, -8, and -9; Dkt. No. 47-7 at 49:2-25, 60:9-17, 105:24-108:12). The testing appears to indicate that some portions of the walls were within specification for plumbness, some portions were outside of specification, and some were inconclusive, or "borderline," as to whether they were within specification. (*See* Dkt. No. 45-3 at pp. 25-30, 80-81; Dkt. Nos. 47-6, -8, and -9).

---

[3] "Plumb" is defined as "exactly in a particular direction, position, or alignment" or "vertically, perpendicularly[.]" *See Plumb*, Oxford English Dictionary (2023), https://www.oed.com/view/Entry/146047?rskey=LErzpU&result=4#eid.

[4] In other words, the parties dispute the degree to which the walls of the administration and maintenance buildings were sufficiently vertical and perpendicular to the foundation to comply with the subcontract's requirements.

As of April 30, 2019, G&C's surveyor, Farnsworth Group ("Farnsworth"), appears to have recommended that the north wall of the maintenance building be torn down. (Dkt. No. 45-3 at pp. 80-81; Dkt. No. 47-6). On that same date, the VA sent G&C a "Notice of Construction Deficiency" as to the north wall of the maintenance building. (Dkt. No. 45-3 at p. 81; Dkt. No. 47-6). Notably, in that letter, the VA states that it did not receive "data resulting from two separate surveys performed to measure the plumbness" of the maintenance building walls. (Dkt. No. 45-3 at p. 80; Dkt. No. 47-6). The VA noted that it was concerned with the findings of the surveys and opined that the walls of the maintenance building were not within the specification for plumbness. (Dkt. No. 45-3 at pp. 80-81; Dkt. No. 47-6).

G&C provided the VA with at least some of the data from the surveys and, in an email dated May 9, 2019 by and between VA representatives, the VA's senior resident engineer opined that all four (4) walls of the maintenance building needed to be demolished and redone. (Dkt. No. 47-17; *see also* Dkt. No. 47-24). The next day, the VA informed G&C by way of email that it would not accept the walls surveyed because they were out of specification, requested that G&C provide a plan for demolition, and inquired whether G&C's surveyor also checked the plumbness of the administration building. (Dkt. No. 47-18; *see also* Dkt. No. 47-24).

On May 13, 2019, G&C sent CCR a "Notice to Cure" letter pursuant to the parties' subcontract. (Dkt. No. 45-3 at pp. 67-68; Dkt. No. 47-19). In that letter, G&C provided CCR forty-eight (48) hours to correct the deficiencies in the work on the administration and maintenance buildings, as well as other alleged defects in G&C's work. (Dkt. No. 45-3 at pp. 67-68; Dkt. No. 47-19). G&C further alleged in the Notice to Cure letter that CCR failed to meet its obligations under the parties' subcontract, amounting to alleged breaches of that agreement. (Dkt. No. 45-3 at p. 67; Dkt. No. 47-19). G&C placed CCR on notice that G&C may seek to collect "all cost

3

impacts associated with" the alleged delay to the critical path work in the Project caused by CCR's alleged breaches. (Dkt. No. 45-3 at pp. 67-68; Dkt. No. 47-19). On May 15, 2019, CCR, through its outside counsel, responded to the Notice to Cure, disputing that it had breached the parties' agreement, contending that G&C did not provide sufficient information to cure any alleged defects, and requesting "an immediate meeting" to address the parties' dispute. (Dkt. No. 45-4 at pp. 61-62; Dkt. No. 47-20). In that letter, CCR's counsel further stated that any attempt by G&C to terminate the parties' subcontract could result in CCR seeking "all available remedies under law or equity." (Dkt. No. 45-4 at pp. 61-62; Dkt. No. 47-20).

Also on May 15, 2019, outside counsel for G&C sent an email to counsel for CCR. (Dkt. No. 45-4 at p. 67). Notably, in that email, G&C's counsel stated that "a major issue has developed between G&C and . . . [CCR.]" (Dkt. No. 45-4 at p. 67). G&C's counsel further stated that the only way to fix the alleged defects in the maintenance and administration building walls was to "tear the buildings down and start over." (Dkt. No. 45-4 at p. 67). Counsel also declined the request for a meeting raised in CCR's counsel's letter, contending that CCR had failed to address the issues properly despite being aware of them for a month. (Dkt. No. 45-4 at p. 67). In reply, CCR's counsel stated that CCR did not have sufficient information, having not seen any reports or had the opportunity to discuss G&C's findings as to the walls of the two buildings. (Dkt. No. 45-4 at p. 66).

On May 16, 2019, G&C provided CCR with a Notice of Termination, terminating the parties' subcontract effective five (5) days after receipt of the Notice by CCR. (Dkt. No. 45-3 at

p. 62; Dkt. No. 47-23). Shortly thereafter, G&C excluded CCR from the worksite and prevented its employees from accessing the Project site and the buildings at issue.[5] (Dkt. No. 45-3 at p. 46).

On May 17, 2019, counsel for CCR emailed G&C's counsel, stating that CCR had learned that G&C was taking steps to demolish the maintenance and administration buildings. (Dkt. No. 45-4 at p. 64). CCR's counsel stated that CCR disputed that it was in default or breach of the parties' agreement and doubted G&C's "ability to proceed with such activities at this time." (Dkt. No. 45-4 at p. 64). That same evening, counsel for G&C replied, clarifying that G&C terminated the parties' subcontract "for default, not convenience." (Dkt. No. 45-4 at p. 64). G&C's counsel did not otherwise address the point that G&C was planning to demolish the maintenance and administration buildings. (Dkt. No. 45-4 at p. 64).

On May 22, 2019, counsel for CCR sent G&C's counsel a letter, asserting that G&C's demolition of the maintenance and/or administration buildings would equate to destruction and spoliation of evidence as to the parties' ongoing dispute. (Dkt. No. 45-4 at pp. 70-71; Dkt. No. 47-25). Accordingly, CCR's counsel demanded that G&C "cease and desist" from any demolition of or modification to the buildings in dispute. (Dkt. No. 45-4 at pp. 70-71; Dkt. No. 47-25). On that same date, Richard Creter of G&C emailed CCR's representatives, attaching some survey results from the maintenance building and an email dated May 10, 2019 from the VA's senior resident engineer outlining a proposed demolition plan. (Dkt. No. 47-24). It does not appear that G&C otherwise responded to the May 22, 2019 letter from CCR's counsel. Additionally, an

---

[5] The parties do not agree as to the date on which G&C precluded CCR from entering the premises. G&C contends, by citing to the May 16, 2019 Notice of Termination, that CCR was excluded from the premises as of May 21, 2019. (Dkt. No. 47 at p. 22 (citing Dkt. No. 47-23)). However, CCR contends that G&C denied it access to the premises as of May 17, 2019 and cites to the Rule 30(b)(6) deposition of G&C's corporate designee, Richard E. Creter, who testified that G&C prohibited CCR from the premises after they were terminated on May 17, 2019. (*See* Dkt. No. 45-2 at p. 16; Dkt. No. 45-7 at 119:2-14).

internal email of G&C representatives dated May 23, 2019 stated that "[i]t is obvious that [CCR] is trying to hold us off knowing that we have to move forward with the work that they failed to do properly" and referenced an "eventual court case." (Dkt. No. 45-5 at p. 4).

From May 22 to June 8, 2019, G&C had a third-party contractor demolish the administration building. (*See* Dkt. No. 45-5 at p. 2). From May 29 through June 10, 2019, that third-party demolished the maintenance building. (*See* Dkt. No. 45-5 at p. 2). During at least a portion of the demolition, a CCR employee was nearby outside of the Project site and observed the buildings' demolition. (Dkt. No. 45-3 at p. 46, 119:2-21).

## II.    PROCEDURAL HISTORY

On December 31, 2019, CCR filed its Complaint, asserting federal question jurisdiction under the Miller Act, 40 U.S.C. § 3131, as well supplemental jurisdiction over its state-law breach of contract claim. (*See generally* Dkt. No. 1). Shortly after filing the Complaint, on March 5, 2020, the parties filed a Joint Motion to Transfer Venue under 28 U.S.C. § 1404(a), pursuant to which the District Court for the District of Colorado ordered the case transferred to the District Court for the District of New Jersey. (*See* Dkt. No. 14).

Through the Complaint, CCR alleges that it entered into a subcontract with G&C on January 4, 2018 to perform various construction work, including masonry, insulation, and caulking. (Dkt. No. 1 at ¶ 7). CCR raises two claims. The first claim is for breach of contract, based on G&C's alleged failure to provide proper notification of the alleged workmanship deficiencies. More specifically, CCR contends that G&C deprived CCR "of an opportunity to investigate the allegations before [G&C] or its agents" demolished evidence that "would allegedly support its claims that CCR had performed non-compliant work." (Dkt. No. 1 at ¶ 16).

CCR's second claim arises under the Miller Act, 40 U.S.C. § 3131. It alleges that G&C "posted a payment bond, provided by Everest, for the Project, in the amount of $31,843,000 . . . ." (Dkt. No. 1 at ¶ 20). CCR further asserts that it is an intended beneficiary of the bond, "entitled to recover . . . for the unpaid balance it is owed for the labor, materials, equipment, and services it provided to the Project." (Dkt. No. 1 at ¶ 22). It requests disbursement of these unpaid sums in accordance with the terms of the bond. (*Id.* at ¶ 37).

On April 21, 2020, Defendants filed an Answer and G&C filed its Counterclaims. (Dkt. No. 22). Through the Counterclaims, G&C alleges that CCR's repeated untimeliness, inadequate work performance, and failure to communicate or remediate the concerns of G&C and the VA "adversely impacted the critical path of the Project," causing G&C to "incur[] unanticipated costs" to complete CCR's work. (Dkt. No. 22 at pp. 8-10). G&C contends that "much of CCR's work had to be removed and replaced, as entire buildings were out of plumb and beyond contractual tolerances." (Dkt. No. 22 at p. 8 ¶ 13). On these bases, G&C asserts counterclaims for breach of contract and unjust enrichment, as CCR unfairly retained "benefits provided by G&C" without remedying G&C's stated issues with the performance. (Dkt. No. 22 at pp. 9-10, ¶¶ 18-27).

On October 21, 2021, CCR filed the instant Motion, seeking dismissal of G&C's Counterclaims and suppression of "the use of all data and documents that were not provided to CCR at the time of termination," or, in the alternative, an adverse spoliation inference against G&C. (Dkt. No. 45-2 at pp. 33-34). CCR also seeks attorneys' fees and costs associated with bringing this Motion. (Dkt. No. 45-2 at pp. 33-34).

## III.   DISCUSSION

### A.   APPLICABLE LAW

As a threshold issue, the parties dispute whether Colorado state law or federal law governs whether sanctions are appropriate in this matter.  G&C argues that the Court must apply Colorado state law, while CCR argues for the application of federal law.  (*See* Dkt. No. 47 at pp. 17-19; Dkt. No. 48 at p. 2).

Here, the Court asserts federal question jurisdiction over CCR's claim arising under the Miller Act, 40 U.S.C. § 3131, *et seq.*, and supplemental jurisdiction over the state law breach of contract claims.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the State."); *see also* 28 U.S.C. § 1367(a) (conferring subject matter jurisdiction over non-federal civil claims that arise from the same case or controversy claims that arise under federal law).  When a federal court exercises supplemental jurisdiction over state law claims, "'the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be tried in a State court.'"  *Felder v. Casey*, 487 U.S. 131, 151 (1988) (quoting *Guar. Tr. Co. v. York*, 326 U.S. 99, 109 (1945)).

As the Court of Appeals for the Third Circuit has recognized, authority exists for either state law or federal law to apply to issues involving sanctions for spoliation.  *See Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994); *see also Capogrosso v. 30 River Court East Urban Renewal Co.*, 482 F. App'x 677, 682 (3d Cir. 2012).  Here, the Court has reviewed the Colorado state law relied upon by G&C as well as the applicable federal law and finds that the laws themselves are not materially different.  In addition, the Court notes that the imposition of sanctions is largely an evidentiary question to be answered within the District Court's discretion.

*See Schmid*, 13 F.3d at 78.  Accordingly, the Court will apply federal law here.  *See Schmid*, 13 F.3d at 78; *State Nat'l Ins. Co. v. Cty. of Camden*, No. 08-5128, 2011 U.S. Dist. LEXIS 164093, at *12 n.1 (D.N.J. June 30, 2011) ("[I]n a diversity lawsuit such as this one, federal law governs the imposition of spoliation sanctions because they constitute an evidentiary matter." (internal quotation omitted)).[6]

**B.    SPOLIATION**

It is well settled that "[s]poliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *see also Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012) (recognizing that spoliation can occur when evidence is destroyed, altered, not preserved, or not produced).  Indeed, a court may find spoliation where: a party exercised control over the evidence; "the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and[] the duty to preserve the evidence was reasonably foreseeable to the party." *Bull*, 665 F.3d at 73 (citation and footnote omitted).  Where a party spoliates evidence in the absence of a court order, the District Court may exercise its inherent powers to impose sanctions as an appropriate remedy.  *See West*, 167 F.3d at 73; *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45 (1991).  Here, the Court must first determine if there has been spoliation of evidence, which in turn depends on

---

[6] The application of federal law conforms to the weight of authority on the issue.  *See Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 943-44 (11th Cir. 2005) (noting that the majority of Circuit Courts of Appeals have applied federal law to resolve questions involving the imposition of sanctions for spoliation of evidence in diversity suits); *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003) (holding that "federal law governs the imposition of spoliation sanctions" because "spoliation sanctions constitute an evidentiary matter" and "in diversity cases, the Federal Rules of Evidence govern the admissibility of evidence in the federal courts.").

whether there was an obligation to preserve, and then, if there has been spoliation, the Court must determine the proper remedial sanction. *See West*, 167 F.3d at 779.

There is no dispute that: the maintenance and administration buildings are relevant to the claims and defenses in this matter; G&C exercised control over those buildings; and G&C had those buildings destroyed before the instant lawsuit was filed. The crux of the issue thus becomes whether G&C had an obligation to preserve those buildings at the time of their destruction. If it did owe such a duty, then there has been spoliation; if it did not owe such a duty, then there can be no spoliation. *See Kounelis*, 529 F. Supp. 2d at 518.

A party in possession of relevant evidence must preserve that evidence if it "knows that litigation by the party seeking the evidence is pending or probable" and "can foresee the harm or prejudice that would be caused to the party seeking the evidence if the evidence were to be discarded." *Id.* Foreseeability is a fact sensitive inquiry that looks to whether the duty to preserve "was objectively foreseeable." *Bull*, 665 F.3d at 78.

Here, the litigation was not pending at the time of the destruction of the buildings. However, CCR, through retained outside counsel, sent various correspondence to G&C and its retained outside counsel regarding the escalation of the parties' dispute over the quality of work performed on the maintenance and administration buildings. (*See* Dkt. No. 45-4 at pp. 61-62, 64, 66, 70-71; Dkt. Nos. 47-20, -24, -25). That correspondence reflects disputes regarding alleged breaches of the parties' contract, the propriety of G&C's termination of the contract, and CCR's reservation of remedies in the event the parties could not reach an amicable resolution. Indeed, G&C's outside counsel acknowledged the seriousness of the parties' dispute and impasse days before the start of demolition on the buildings. (*See* Dkt. No. 45-4 at p. 67). Although CCR did not formally request an inspection of the buildings in those days leading to the demolition of the

buildings, CCR did request a meeting and additional information as to G&C's claim that CCR's work was defective. (*See* Dkt. No. 45-4 at pp. 66-67). Yet, G&C declined the requests for a meeting and additional information. (*See* Dkt. No. 45-4 at pp. 66-67).

Notably, on May 17, 2019—which was about five days before the start of demolition on the administration building—CCR sent G&C an email advising of concerns relating to the impending demolition of the two buildings. (Dkt. No. 45-4 at p. 64). And on the same day as the start of the demolition on the administration building, on May 22, 2019, CCR sent G&C a formal cease and desist letter, asserting that the destruction of the buildings would constitute spoliation of evidence relevant to the dispute. (Dkt. No. 45-4 at pp. 70-71; Dkt. No. 47-25). Moreover, on May 23, 2019—which was about six days before the start of the demolition on the maintenance building—G&C representatives acknowledged there would be an "eventual court case" regarding the dispute with CCR and the two buildings. (Dkt. No. 45-5 at p. 4).

Considering the record, the Court finds that it was reasonably foreseeable to G&C that litigation was probable between it and CCR and that CCR may be harmed without the benefit of an opportunity to fully test the alleged defects in the maintenance and administration buildings. While G&C argues that CCR did not make any formal request to inspect or test the buildings, and that CCR could have done so before the destruction while CCR still had access to the buildings, CCR, however, did not, at the time, have the benefit of all the surveys and data collected by G&C such that CCR or any experts it may retain could fully evaluate the buildings in light of the same data held by G&C. *See Capogrosso*, 482 F. App'x at 683 (affirming imposition of sanctions where the plaintiff claimed insurer had ability to inspect the property before the alleged destruction of the property/evidence but such inspection was limited to plaintiff's initial damages claim rather than her full claim).

As the party with control over the evidence, G&C owed a duty to preserve that evidence once it became foreseeable that the parties would be unable to resolve their disputes without litigation. Here, potential litigation was foreseeable at the latest as of May 17, 2019, when counsel for CCR advised of CCR's concerns with the destruction of the buildings and the impasse in the parties' positions were clear. Accordingly, the Court finds that G&C owed a duty to preserve the two buildings at issue but failed to do so; therefore, G&C has spoliated relevant evidence.

C.   APPROPRIATE SANCTION

Having found that spoliations has occurred, the Court must now determine the appropriate sanction, if any. *See Kounelis*, 529 F. Supp. 2d at 519. Sanctions can include dismissal of a claim or defense, suppression of evidence, an adverse inference, fines, and/or an award of attorneys' fees and costs. *See id.* (quoting *Mosaid Tech. Inc. v. Samsung Elec. Co.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004)). In fashioning an appropriate sanction, the Court considers the degree of fault on the party who spoliated, the degree of prejudice suffered by the opposing party, and "whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid*, 13 F.3d at 79. Notably, "[a] dispositive sanction is warranted only where 'the non-responsible party's case is severely impaired because it lacked the information that was not produced.'" *GN Netcom, Inc. v. Platronics, Inc.*, 930 F.3d 76, 82 (3d Cir. 2019) (quoting *Bull*, 665 F.3d at 83).

Here, CCR seeks as sanctions the dismissal of G&C's counterclaim and suppression of the data and documents relied upon by G&C but not provided to CCR at the time of the termination of the parties' contract. In the alternative, CCR seeks an adverse spoliation inference against G&C.

Here, the Court considers the relevant factors in turn to determine the appropriate sanctions in light of G&C's spoliation.

### 1.    Degree of G&C's Fault

First, as to the degree of G&C's fault, G&C contends that the buildings were not demolished to prevent the introduction of relevant evidence at trial. (Dkt. No. 47 at p. 29). Rather, G&C asserts that because of its contractual obligations to the VA, it was obligated to proceed expeditiously to complete the Project.[7] (Dkt. No. 47 at p. 19).  G&C appears to have been tasked with choosing between its obligations to the VA and its obligations to preserve the buildings as evidence for its dispute with CCR.  Yet, those obligations were not necessarily diametrically opposed.  G&C could have provided CCR with the complete data on which G&C relied to find the buildings were defective and could have also provided a final right to access and test the buildings when it terminated the parties' agreement on May 16, 2019.  That would have provided CCR with an opportunity to review in full G&C's claims of defects in the work performed on those buildings and, upon such review, could have also permitted G&C to proceed with the Project in a timely fashion.  Moreover, G&C claims that it would have incurred liquidated damages for further delays in the Project through its contract with the VA; yet, G&C could have sought to pass on those liquidated damages to CCR should G&C succeed on its Counterclaims in this action.

Ultimately, G&C intentionally proceeded with demolishing the buildings, notwithstanding the repeated correspondence from CCR's outside counsel regarding the impasse of the parties' dispute and the lack of sufficient data provided to CCR.  While G&C was faced with a difficult

---

[7]  The parties do not dispute either the existence of these obligations or the prospect that G&C would be subject to contractual damages as a result of delays. (*See* Dkt. No. 48 at pp. 18-19).

13

choice between its obligations, G&C had alternative recourse to the immediate destruction of the maintenance and administration buildings, i.e., there was an alternative to spoliation. Indeed, G&C must have known that the buildings "would be essential evidence" in the parties' dispute and eventual litigation. *Capogrosso*, 482 F. App'x at 682. Accordingly, the Court finds that G&C's degree of fault is relatively high based on the record presented.

### 2.    Degree of Prejudice to CCR

Second, the Court also considers the degree of prejudice that CCR suffers from G&C's destruction of the buildings at issue. Here, it is undisputed that CCR and its litigation experts are unable to fully test and evaluate the plumbness of the buildings because G&C demolished the buildings. While CCR did have access to the buildings for a period of time, it is undisputed that, at least at some point in time, G&C discontinued that access. Notably, G&C ultimately had greater access to the buildings and opportunity to survey the purported defects, including after termination of the parties' subcontract. (*See* Dkt. No. 47 at p. 22).

The Court also notes that, with respect to the administration building, G&C only notified CCR of the purported plumbness issues in the Cure Notice provided on May 13, 2019. (Dkt. No. 47 at p. 22). As a result, CCR had even fewer opportunities, if any, to rebut G&C's contentions regarding the administration building's compliance with the parties' contractual specifications. Accordingly, G&C's demolition of the two buildings has unduly prejudiced CCR in its ability to maintain its claims and defenses with respect to both buildings at issue.

### 3.    The Lesser Sanction

In the first instance, CCR seeks dismissal of G&C's counterclaim and suppression of its evidence regarding the plumbness of the maintenance and administration buildings that was not

provided to CCR at the time of the termination of the parties' contract. Alternatively, CCR seeks an adverse inference. The Court of Appeals for the Third Circuit directs courts to consider whether there is a lesser sanction than dismissal that is appropriate to avoid substantial unfairness and deter such conduct in the future. *See Schmid*, 13 F.3d at 79; *accord GN Netcom*, 930 F.3d at 82. Because of this directive, the Court considers the lesser sanction sought (an adverse instruction) first to determine if such sanction is appropriate. *See GN Netcom*, 930 F.3d at 84 ("The District Court appropriately relied on the principle that a dispositive sanction is a last resort and should be imposed if no alternative remedy is available." (internal quotation marks and citation omitted)). Ultimately, the District Court exercises discretion to determine the appropriate sanction. *See, e.g., Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1326 (Fed. Cir. 2011); *Kounelis*, 529 F. Supp. 2d at 520-21.

Here, to be entitled to a spoliation inference, G&C must have actually suppressed or withheld relevant evidence. *Cf. Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995) ("No unfavorable inference arises . . . where the failure to produce [the evidence in question] is otherwise properly accounted for." (alterations in original omitted)); *see also Bull*, 665 F.3d at 79 ("[A] finding of bad faith is pivotal to a spoliation determination."). As discussed above, the Court finds that G&C intentionally withheld evidence of the buildings' purported defects during a critical stage of the parties' dispute, during which time G&C had exclusive access to and control over evidence that was foreseeably relevant to this proceeding. Though CCR was involved in some pre-demolition inspections and data collection, G&C failed to provide CCR an opportunity to inspect the buildings in anticipation of litigation, whereas G&C did have that opportunity. Accordingly, the Court balances the need to cure the prejudice to CCR and the need to deter future such conduct, which in this instance the Court finds to be a singular event based on specific facts

15

and circumstances.  In light of that, the Court finds that an adverse inference at trial based on G&C's spoliation of relevant evidence would adequately rectify the undue prejudice to CCR and deter such conduct in the future.  Upon that inference, the jury may consider the instruction and determine the issues accordingly.  Because the Court finds that an adverse interest is the lesser, appropriate sanction, the Court declines to further discuss the request for a dismissal and suppression of G&C's data.

### D.   ATTORNEYS' FEES AND COSTS

CCR also seeks an award of attorneys' fees and costs.  Here, upon due consideration of the facts giving rise to this Motion, the Court exercises its discretion and declines to grant that request.  The spoliation at issue here occurred prior to the commencement of litigation, and G&C has not disobeyed or otherwise evaded this Court's Orders.  G&C was faced, at the time, with meeting obligations it deemed it owed to the VA and obligations it owed to preserve evidence for its dispute with CCR.  While G&C chose the course of spoliation in the face of those choices, the Court does not find G&C's conduct rising to a level justifying an award of attorneys' fees and costs in addition to the sanctions already imposed herein.  *See Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 84 (D.N.J. 2006) ("The Court has broad discretion regarding the type and degree of sanctions it can impose, but the sanctions must be just and related to the claims at issue." (citations omitted)).

## IV.   CONCLUSION

For the foregoing reasons, and for other good cause shown, the Court finds that CCR is entitled to an adverse inference at trial based on G&C's spoliation of relevant evidence.  Accordingly, having considered the parties' submissions and oral argument, and for the reasons set forth herein and for other good cause shown,

**IT IS, THEREFORE**, on this **2d** day of **May 2023**, hereby

**ORDERED** that CCR's Motion for Sanctions for Spoliation of Evidence (Dkt. No. 45) is **GRANTED IN PART** and **DENIED IN PART**; and it is further

**ORDERED** that the Clerk of Court is hereby directed to **TERMINATE** the Motion pending at Docket Entry No. 45.

**SO ORDERED**.

/s/ Rukhsanah L. Singh

**RUKHSANAH L. SINGH**
**UNITED STATES MAGISTRATE JUDGE**