**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES FOR THE USE OF COLORADO CUSTOM ROCK CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>G&C FAB-CON, LLC and EVEREST REINSURANCE CO.,<br><br>Defendants. | Civil Action No. 20-02968 (GC) (RLS)<br><br>**MEMORANDUM ORDER** |

**CASTNER, U.S.D.J.**

**THIS MATTER** comes before the Court upon four Motions *in Limine* submitted by the parties in advance of trial. (ECF Nos. 76, 78, 79, 80.) The parties were given an opportunity to oppose, and after careful review, the Court now decides the motions without oral argument pursuant to Federal Rule of Civil Procedure ("Rule") 78(b) and Local Civil Rule 78.1(b).

## I.   BACKGROUND

This case arises from a federal construction project known as the "Pike's Peak National Cemetery Project," located in Colorado Springs, Colorado. (ECF No. 96 at 1.[1]) The project involved the construction of a United States Department of Veteran Affairs (the "VA") national cemetery. (*Id.*) The VA entered into a contract with G&C Fab-Con, LLC, the prime contractor on the project. (*Id.*) G&C then entered into a subcontract with Colorado Custom Rock Corp., for

---

[1]     Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

Colorado Custom to perform masonry work on two buildings: the project's administrative building and the maintenance building. (*Id.*) G&C posted a performance bond for the project that was provided by Everest Reinsurance Co. (*Id.* at 1-2.)

Plaintiff's position is that it performed its masonry work in accordance with the subcontract, and G&C breached the subcontract by improperly terminating Colorado Custom and failing to pay for its work. (*Id.* at 2.) Defendants' position is that Colorado Custom's work was defective due to alleged plumbness[2] issues and, therefore, Colorado Custom was properly terminated in accordance with the subcontract. (*Id.*) Defendants also contend that G&C was compelled to perform extensive corrective work, which resulted in costs that far exceed any amounts that may have been due to Colorado Custom under the subcontract. (*Id.*)

On August 8, 2023, the Court issued a Pretrial Scheduling Order directing the parties to submit their anticipated motions *in limine*. (ECF No. 74.) Trial was scheduled to commence on September 25, 2023. (*Id.*) On August 10, 2023, Defendants submitted three motions *in limine* (ECF Nos. 76, 78, 80), and Plaintiff submitted one motion *in limine* (ECF No. 79). The parties responded to the respective motions on August 16. (ECF Nos. 86-89.) Trial was subsequently post-postponed until February 27, 2024, due to the inability of one of the expert witnesses to travel to New Jersey to testify at trial. (ECF Nos. 117 & 121.)

## II.  **LEGAL STANDARD**

District Courts have "wide discretion in determining the admissibility of evidence under the Federal Rules." *United States v. Abel*, 469 U.S. 45, 54 (1984). "Unlike a summary judgment motion, which is designed to eliminate a trial in cases where there are no genuine issues of fact, a

---

[2]     Plumbness refers to the quality or state of being plumb or vertical.

motion *in limine* is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990).

"The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *United States v. Tartaglione*, 228 F. Supp. 3d 402, 406 (E.D. Pa. 2017). "Evidence should not be excluded pursuant to a motion *in limine*, unless it is clearly inadmissible on all potential grounds. . . . The movant bears the burden of demonstrating that the evidence is inadmissible on any relevant ground, and the court may deny a motion *in limine* when it lacks the necessary specificity with respect to the evidence to be excluded." *Leonard v. Stemtech Health Scis., Inc.*, 981 F. Supp. 2d 273, 276 (D. Del. 2013) (citations omitted).

A trial court's ruling on a motion *in limine* is "subject to change when the case unfolds, particularly if actual testimony differs from what was contained in the movant's proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Luce v. United States*, 469 U.S. 38, 41-42 (1984); *see also Faragalla v. Otundo*, 626 F. Supp. 3d 783, 785 (D.N.J. 2022) ("Because a ruling on a motion *in limine* is 'subject to changes as the case unfolds,' this ruling constitutes a preliminary determination in preparation for trial." (quoting *United States v. Perez*, Crim. No. 09-1153, 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011))).

## III. DISCUSSION

### A. MOTION TO PRECLUDE FACT TESTIMONY OF CALEB BAUSERMAN

Defendants G&C and Everest move to preclude the fact testimony of non-party Caleb Bauserman, a former employee of Colorado Custom. (ECF No. 76.) According to Defendants, Mr. Bauserman was a supervisor for Colorado Custom "during the most critical time frames"—when the allegedly "defective work was performed, . . . was discovered, and when testing of the

masonry walls at issue took place." (ECF No. 76-1 at 5.)  Furthermore, Mr. Bauserman supposedly "conducted a plumb bob survey" that is relevant to the parties' dispute as to whether the masonry walls were "constructed significantly out of plumb."  (*Id.*)   Despite the relevance of Mr. Bauserman's testimony, Defendants argue that he should not be allowed to testify because he failed to contact them or attend a deposition on March 9, 2021, even though they served a deposition subpoena on February 27, 2021.  (*Id.* at 5-6.)

In opposition, Plaintiff argues that G&C and Everest are seeking to punish it for their own tactical errors.  (ECF No. 89-1 at 4.)  Notably, when Mr. Bauserman did not appear at the March 9, 2021 deposition, Defendants filed a petition to compel his appearance but chose to voluntarily withdraw that petition on May 13, 2021, prior to the close of fact discovery.  (*Id.*)  Plaintiff submits that it would be unfair to bar Mr. Bauserman's testimony at trial because it "played by the rules, providing . . . Mr. Bauserman's last known address and telephone number," and G&C did not act diligently despite knowing that Mr. Bauserman is a material witness.  (*Id.* at 8.)

The Court agrees that there is no basis presented to bar Mr. Bauserman from being called by Plaintiff as a fact witness at trial.  As Defendants acknowledge, Mr. Bauserman's testimony is likely to be highly relevant to the disputed factual issues, and there is no indication that Plaintiff acted in bad faith, had control over its former employee, or is responsible for Mr. Bauserman's failure to appear for his deposition.  Indeed, it is undisputed that Plaintiff identified Mr. Bauserman to Defendants in September 2020 as one of three individuals who "reviewed, supervised, or approved" the work on the project.  (ECF No. 39-4 at 7.)  Plaintiff also provided Mr. Bauserman's telephone number.  (*Id.*)  After Mr. Bauserman failed to appear for the March 9, 2021 deposition, Defendants filed a petition with this Court for issuance of a Commission.  (ECF No. 39.)  In that petition, they confirmed that counsel for Plaintiff had informed them that Colorado Custom "would not be representing Mr. Bauserman as a former employee . . . and provided his last known address

such that an appropriate subpoena for deposition could be prepared." (*Id.* at 3.)  Rather than await a ruling from the Court, however, Defendants withdrew their petition on May 13, 2021, without providing a reason for that decision.  (ECF No. 41.)  Then they waited until August 2023, more than two years later, to seek to preclude Mr. Bauserman's testimony.  They have not explained what, if any, steps they took between May 2021 and August 2023 to secure the deposition of Mr. Bauserman and why they did not follow through on their petition.

Under similar circumstances, district courts in this Circuit have refused to bar non-party testimony.  In *Galloway v. Islands Mechanical Contractor, Inc.*, for example, the district court denied the plaintiff's motion to preclude the trial testimony of a former employee of the defendant, even though the former employee had failed to appear at a deposition.  Civ. No. 08-071, 2012 WL 5830710, at *1 (D.V.I. Nov. 16, 2012).  The plaintiff had not filed a motion to hold the non-party witness in contempt, and the court found that "having failed to pursue the only sanction available for a non-party witness under the [Federal Rules of Civil Procedure], [the] [p]laintiff is not . . . entitled to have [the] Court impose the sanction of precluding [the witness's] testimony at trial." *Id.* (citing Fed. R. Civ. P. 37(b)(1)).

Similarly, in *Pagano v. Straccialini*, the district court denied the defendants' motion to preclude the trial testimony of two non-parties who had "witnessed the incident that g[a]ve[] rise to [the] litigation," even though the witnesses had repeatedly failed to appear for their depositions. Civ. No. 07-1698, 2008 WL 11509907, at *1 (D.N.J. Oct. 17, 2008).  A non-party who ignores a subpoena can be found in contempt, emphasized the court, but it identified no support for the "position that a party may be sanctioned for the failure of a non-party witness to appear for deposition." *Id.* at *2.  Accordingly, the court concluded that there was "no basis to impose upon [the plaintiff] a preclusion sanction for the failure of the non-party witnesses to attend their depositions." *Id.*

Here, too, there is no good reason to preclude Plaintiff from calling Mr. Bauserman, a non-party fact witness, to testify at trial.[3]  Defendants voluntarily withdrew their petition to compel Mr. Bauserman's deposition, and there is no suggestion that they sought to hold Mr. Bauserman in contempt.  When Mr. Bauserman failed to appear in March 2021, after the single attempt to depose him, Defendants took no further action and waited two years to file the present motion *in limine* to exclude his testimony from trial.  Their conduct does not speak to diligence, nor have they demonstrated that Plaintiff bears any fault for Mr. Bauserman's failure to appear for his deposition.  There is thus no reason for this Court to exercise its discretion to exclude this material witness's relevant testimony from trial.  *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 297 (3d Cir. 2012) ("[E]xclusion of critical evidence is an 'extreme' sanction, and thus, a district court's discretion is not unlimited." (quoting *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997))).

In the alternative, Defendants now seek to depose Mr. Bauserman before trial, but fact discovery in this case has long been closed.  The Court declines to reopen fact discovery or to welcome briefing on a belated motion to compel.  *See Stambler v. RSA Sec., Inc.*, 212 F.R.D. 470, 472 (D. Del. 2003) ("In every [case] there comes a time when discovery must be closed for the

---

[3]      In their moving papers, Defendants cite to unreported decisions from courts outside the Third Circuit.  Even those decisions do not help their case, however.  In *JAT, Inc. v. Nat'l City Bank of the Midwest*, for example, after the witness cancelled the scheduled deposition and "refused to appear," the defendants "made numerous attempts to reschedule [the] deposition." Civ. No. 06-11937, 2008 WL 1820841, at *1 (E.D. Mich. Apr. 22, 2008).  Despite these repeated attempts, the witness engaged in "continued refusal to obey the . . . subpoena." *Id.* at *2.  On this record, the court found that the witness was in contempt of the subpoena under Rule 45(e), and it barred his testimony from trial, finding that the defendants had "acted diligently in pursuing [the witness's] appearance pursuant to the subpoena." *Id.* at *3.  Here, Defendants have not demonstrated that they made "numerous attempts" to depose Mr. Bauserman, nor that they moved to hold him in contempt.

issues to be resolved through . . . trial."). Accordingly, Defendants' motion as to Mr. Bauserman is denied in its entirety.

### B. MOTION FOR ADVERSE INFERENCE JURY INSTRUCTION BASED ON SPOLIATION

Defendants G&C and Everest move for an adverse jury instruction based on Plaintiff's alleged spoliation of evidence—a May 7, 2019 plumb bob survey. (ECF No. 78.) Defendants contend that a "primary issue" at trial will be whether Plaintiff constructed "masonry walls . . . significantly out of plumb at a newly constructed maintenance building . . . , resulting in the VA rejecting all masonry walls that were out of specification." (ECF No. 78-1 at 4.) According to Defendants, Plaintiff's employees performed a plumb bob survey of the maintenance building on May 7, 2019, but no records of this testing were ever produced in the litigation. (*Id.* at 11-12.) They contend that the "failure to produce the results of [the] plumb bob survey" has led to "significant prejudice," namely, the loss of evidence that "could have corroborated all of the other surveys and analyses conducted in this matter." (*Id.* at 19-20.) They write that this would have "effectively amount[ed] to an admission that the walls of the [m]aintenance [b]uilding were not plumb and outside the tolerance levels dictated by the project specifications. Such evidence would have been critical to G&C's defenses . . . and G&C's counterclaim in this matter." (*Id.* at 20.)

In opposition, Plaintiff presses three arguments: (1) "G&C has not shown that [Colorado Custom] ever possessed any evidence regarding the plumb bob tests to spoliate"; (2) "G&C admits that [it] 'documented the results of its plumb bomb survey conducted at the same time'" as Colorado Custom; and (3) "[i]f G&C had not destroyed the buildings at issue . . . , there would be no need to argue about records of an alleged . . . plumb bob test." (ECF No. 88-1 at 8-12.)

Having carefully reviewed the parties' submissions, the Court agrees that Defendants have not demonstrated that there was, in fact, evidence stemming from a May 7, 2019 plumb bob survey that was spoliated as to warrant an adverse inference. *See Bull v. United Parcel Serv., Inc.*, 665

F.3d 68, 73 (3d Cir. 2012) ("Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party."). Notably, the motion *in limine* claims that "[n]o records regarding the results of this testing have ever been provided to G&C," but Defendants do not point to anything that supports the inference that there were documents or evidence that resulted from the testing that could have been produced that were destroyed or withheld by Plaintiff. (ECF No. 78-1 at 12.) Instead, Defendants cite a May 7, 2019 "Subcontractor Daily Field Report" that simply states that Colorado Custom "checked plumbness of maintenance building" as well as testimony from Larry Marti, co-owner of Colorado Custom, who confirmed that field notes from Mr. Bauserman indicate that "a plumb bob test of some type was performed [that] day." (ECF No. 78-11 at 177; ECF No. 78-16 at 2.) On this record, and without something more concrete, the Court cannot find that spoliation has occurred. That a plumb bob test was done on May 7, 2019, does not prove that there were any records from that test—other than what has been produced—that were spoliated. Accordingly, Defendants' motion for an adverse inference is denied.

### C. MOTION TO EXCLUDE EVIDENCE OF DAMAGES

Plaintiff Colorado Custom moves to exclude evidence of damages for G&C's breach of contract counterclaim. (ECF No. 79.) Specifically, Plaintiff seeks to exclude damages testimony from fourteen representatives of various subcontractors allegedly retained by G&C to remedy the defects in Colorado Custom's work.[4] (ECF No. 79-2 at 7.) Plaintiff also seeks to exclude twenty

---

[4]    The subcontractors are M&S Civil Consultants; PenHall Company; Nuway, Inc.; Barton Materials, LLC; Max True Fireproofing Co.; Waco Scaffolding & Equipment Co.; Basalite Building Products, LLC; United Rentals; HD Supply Construction Supply, Ltd.; RK Mechanical, Inc.; Don Hall Masonry, Inc.; Rocky Mountain Group; Farnsworth Group, Inc.; and Bybee Stone Company, Inc. (ECF No. 79-2 at 7.) The only witness identified by name is for M&S Civil

proposed exhibits,[5] including a demonstrative exhibit showing the alleged extra costs G&C incurred to redo and complete Colorado Custom's work and reports detailing costs paid to each of the subcontractors.  (*Id.* at 10.)

To support its exclusion motion, Plaintiff emphasizes three discovery-related points.  *First*, G&C's initial disclosures simply stated that "G&C claim[ed] damages in an amount in excess of $1,000,000" and were never updated to provide any further detail.  (ECF No. 79-3 at 4.)  *Second*, G&C answered interrogatories on damages by stating, in relevant part, that "the determination of G&C's damages [was] subject to ongoing discovery and G&C ha[d] not completed analysis" and that "the amount of damages [would] likely be analyzed by G&C's experts, who [would] be disclosed as part of G&C's expert disclosures."[6]  (ECF No. 79-4 at 10-11.)  *Third*, G&C did not "identify an expert to opine on the amount of damages," and G&C's single expert report supplementing its interrogatory responses is "silent as to any damages."  (ECF No. 79-2 at 9.)

Considering the above, Plaintiff contends that it was unfairly surprised when G&C asserted in the Final Pretrial Order that it would be pursuing $1,306,061.95 in damages and listed the representatives of the subcontractors as potential damages witnesses and listed as exhibits the reports detailing the amounts paid to each subcontractor.  (ECF No. 72 at 4.)  Plaintiff accuses G&C of engaging in "trial by ambush" in violation of Rules 26 and 37.  (ECF No. 79-2 at 11-13.)

---

Consultants; the other proposed subcontractor witnesses are referred to generically as an unnamed "representative."  (ECF No. 104 at 8-10.)

[5]      The exhibits challenged are Exhibits 78-97 on Defendants' Exhibit List.  (ECF No. 72-2.)

[6]      The interrogatories asked G&C to state the amount of damages related to Colorado Custom's alleged delays and how it was calculated, the amount of damages related to alleged defective work and how it was calculated, and any other damages and how it was calculated.  (ECF No. 79-4 at 10-11.)

In opposition, G&C emphasizes two discovery-related points. *First*, each proposed exhibit in support of damages (except for demonstrative Exhibit 78[7]) "was timely produced [to Colorado Custom] prior to the discovery deadline." (ECF No. 86-1 at 11.) *Second*, Plaintiff deposed four G&C employees during discovery and did not "ask a single question . . . pertaining to G&C's damages" and "did not even identify damages as an area of inquiry on its 30(b)(6) deposition notice directed to G&C." (*Id.* (emphasis removed).)

Considering this, G&C insists that Plaintiff's objections are overblown. G&C writes that when this case was filed, its damages were still being incurred and "G&C was paying invoices related to the rebuild through the [f]all of 2020." (ECF No. 86-1 at 9-10.) Although G&C acknowledges that its initial disclosures and interrogatories did not provide a sufficiently detailed computation of damages, its explanation is that "it had not yet completed paying its subcontractor invoices" and "could not have provided a more formalized calculation . . . a[t] that time." (*Id.* at 10-11.) It believes that producing the damages documents during discovery was sufficient to remedy any alleged prejudice, and G&C points specifically to a document it produced titled "G&C's Fab-Con's Excess Cost to complete CCR's Masonry Contract." (ECF No. 86-2.) The summary lists the direct costs to complete Plaintiff's contract work, the indirect/administrative costs, and subtracts the contract balance that was allegedly owed to Plaintiff from the costs to arrive at the damages amount: $1,306,061.95, the same amount now listed in the Final Pretrial Order. (*Compare id.*, *with* ECF No. 104 at 4.)

Under Rule 26, a party seeking damages is required to include in its initial disclosures "a computation of each category of damages" plus "the documents or other evidentiary material . . . on which each computation is based." Fed. R. Civ. P. 26(a)(1)(A)(iii). A party then has a

---

[7]     G&C claims that "a different version of the same document was produced during discovery." (ECF No. 86-1 at 11.)

continuing obligation to supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

Rule 37 ensures compliance. "If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In addition, a court "may order payment of the reasonable expenses, including attorney's fees, caused by the failure; . . . may inform the jury of the party's failure; and . . . may impose other appropriate sanctions." Fed. R. Civ. P. 37(c)(1)(A)-(C).

"Rule 37 is written in mandatory terms, and 'is designed to provide a strong inducement for disclosure of Rule 26(a) material.'" *Estes Express Lines v. U.S.A Lamp & Ballast Recycling, Inc.*, Civ. No. 21-00609, 2023 WL 3766020, at *5 (W.D. Pa. June 1, 2023) (quoting *Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 156 (3d Cir. 1995)). Nevertheless, as provided in the rule, "sanctions should not be imposed if a failure to disclose or supplement was 'substantially justified'" or "harmless." *Id.* The party alleged to have failed to comply bears "the burden of proving substantial justification for its conduct or that the failure to produce was harmless." *Id.* (citation omitted).

In determining if exclusion of evidence is an appropriate sanction for failure to comply with discovery duties, the Third Circuit directs courts to consider:

> (1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or wilfulness in failing to comply with a court order or discovery obligation.

> [*Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000).]

"Courts also look to the importance of the evidence to the proffering parties' case." *Gutierrez v. Pell*, Civ. No. 20-6101, 2022 WL 1110593, at *2 (E.D. Pa. Apr. 13, 2022). "The Third Circuit has, on several occasions, manifested a distinct aversion to the exclusion of important testimony absent evidence of extreme neglect or bad faith on the part of the proponent of the testimony." *ABB Air Preheater, Inc. v. Regenerative Env't Equip. Co.*, 167 F.R.D. 668, 671 (D.N.J. 1996) (collecting cases); *see also Quinn v. Consol. Freightways Corp. of Delaware*, 283 F.3d 572, 576 (3d Cir. 2002) ("[T]he exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." (citation omitted)).

Based on the submissions and considering the relevant factors, the Court will not grant the broad sanction of excluding all damages evidence in support of G&C's counterclaim. Instead, the Court excludes the undisclosed testimony on damages from the representatives of the fourteen subcontractors but declines to exclude the twenty exhibits supporting G&C's damages claim (Exhibits 78-97[8]).

As to the proposed testimony from the subcontractors, it would be prejudicial to Plaintiff to allow these representatives (most of whom are unnamed in the Final Pretrial Order) to testify on damages when they were not identified in G&C's initial disclosures or interrogatory responses as possessing knowledge relevant to G&C's claim for damages.[9]  G&C offers no other instance

---

[8]    The Court reserves on any objection to demonstrative Exhibit 78 on the basis that it was not produced in discovery, and if Plaintiff objects to this specific exhibit, it can raise the objection at trial.

[9]    Plaintiff notes that it obtained documents and/or deposed four of the undisclosed witnesses on "liability, but not damages."  (ECF No. 79-2 at 7 n.1.)

when it identified these persons as having relevant testimony on damages before the Final Pretrial Order. Plaintiff thus did not have fair notice or an opportunity to depose them on damages. *See Sabol v. Allstate Prop. & Cas. Ins. Co.*, 309 F.R.D. 282, 287 (M.D. Pa. 2015) ("This prejudice will be substantial because it is nearly impossible for [a party] to investigate and prepare to defend itself at trial when it has been given no . . . names of witnesses during discovery."). G&C's interrogatory responses also suggested that the support for its damages would be in the form of an expert report on damages, which G&C ultimately did not provide. While this omission may not have been done in bad faith, G&C knew or should have known what its obligations were and given timely updates.

Under these circumstances, there is no means to cure this prejudice without reopening discovery and forcing Plaintiff to interrupt its trial preparation and to bear the added expense of engaging in depositions of the fourteen representatives on damages, which is unreasonable at this late stage and with trial impending. *See Young v. Pleasant Valley Sch. Dist.*, Civ. No. 07-854, 2011 WL 1485648, at *2 (M.D. Pa. Apr. 19, 2011) ("It is unclear how this prejudice can be cured. Counsel[] . . . ignores not only the case management plan . . . , but also the burden that would be placed on Defendants if they were required, at this late date, to interrupt trial preparation."). The Court is also concerned that permitting these individuals to testify on damages would disrupt the orderly process of the trial by leading to delays resulting from surprise testimony and an abundance of objections.

In comparison, the Court finds any prejudice as it relates to the exhibits substantially lessened because the documents that G&C anticipates relying on were produced to Plaintiff during discovery. According to G&C, it also produced a damages summary that explained how G&C believes its damages should be calculated. Further, Plaintiff had the opportunity to depose several of G&C's employees and apparently did not ask about the documents or the basis for G&C's

damages.  On this record, the Court is unconvinced that excluding the exhibits from trial is a reasonable sanction for the incomplete initial disclosures and interrogatory responses.  Indeed, even when "calculations of damages have not been disclosed until shortly before trial, courts have denied motions *in limine* because the underlying facts were previously known or disclosed to the opposing party."[10] *Norfolk S. Ry. Co. v. Pittsburgh & W. Virginia R.R.*, Civ. No. 11-1588, 2015 WL 4376462, at *2 (W.D. Pa. July 15, 2015).

Finally, Plaintiff argues that certain of the exhibits (Exhibits 80-86, 89-90, 92, 95-96) "are nothing more than subcontractor detail or invoice reports that summarize various invoices" and "are improper summaries under" Federal Rule of Evidence 1006.  (ECF No. 79-2 at 27.)  The invoices "are not so voluminous," posits Plaintiff, "that they cannot be conveniently examined" nor has G&C "identified these [invoices] as exhibits" or "made them available."  (*Id.* at 26-27.)  G&C counters by arguing that the reports "are kept in the ordinary course of G&C's business pursuant to an established business procedure, and depict the amounts paid to certain subcontractors. The[] records will be authenticated by a G&C employee at trial.  As such, they qualify as business records and are admissible at trial."  (ECF No. 86-1 at 28.)

The Court will reserve at this time as to the parties' disagreement as to whether the invoice detail reports are improper summaries or admissible business records.  In similar postures, other courts have noted that such a dispute often requires some "further testimony and other evidence to establish" whether the documents proffered should be disqualified from admission under Fed. R.

---

[10]    Colorado Custom relies on the district court's opinion in *Mercedes Benz USA LLC v. Coast Automotive Group Limited* for its position that all evidence of damages, including the proposed exhibits, should be excluded at this point. Civ. No. 99-3121, 2008 WL 4378294 (D.N.J. Sept. 23, 2008).  There, unlike here, the party seeking an exclusion order had utilized the depositions to try to interrogate the method of damages calculation and there was no "additional action" that could have been "taken to avoid the prejudice." *Id.* at *4.  There was also no suggestion in *Mercedes Benz* that the offending party had produced a summary of its damages or other documents that detailed the costs incurred.

Evid. 1006 or admitted as business records under Fed. R. Evid. 803(6).  *In re Tri Harbor Holdings Corp.*, Civ. No. 19-13448, 2022 WL 17185100, at *10 (Bankr. D.N.J. Nov. 22, 2022) (collecting cases); *see also United States v. Benko*, Civ. No. 15-00159, 2016 WL 4705572, at *1 (M.D. Pa. Sept. 8, 2016) (resolving after "conven[ing] a hearing on the motion").  Accordingly, this objection may be raised at trial.

### D.  MOTION TO PRECLUDE EXPERT TESTIMONY OF MICHAEL SCHULLER

Finally, Defendants G&C and Everest move to preclude the trial testimony of Plaintiff's expert, Michael Schuller.  (ECF No. 80.)  Styled as an *in limine* and *Daubert* motion, Defendants argue that Colorado Custom has failed to prove that Mr. Schuller "used reliable methodology to formulate his opinion" and, as a result, the expert testimony is inadmissible.[11]  (ECF No. 80-1 at 7.)

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which sets forth:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and

---

[11]     Courts often hold *Daubert* hearings before determining whether to exclude expert testimony.  Where, however, a court has before it the information "necessary to determine how the expert reached his opinion," a district court need not hold an *in limine* hearing before ruling on the objection.  *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 155 (3d Cir. 2000).  Here, the Court finds that it has the information necessary to rule on this *in limine* motion without a hearing.

> **(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.
>
> [Fed. R. Evid. 702.]

Under this rule, a court "acts as a 'gatekeeper' to ensure" that expert evidence is relevant and reliable. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).

"To be admissible, expert testimony must satisfy three requirements . . . : (1) the witness must be an expert (i.e. must be qualified); (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge (i.e. must be reliable); and (3) the expert's testimony must assist the trier of fact (i.e. must fit)." *Equinox Properties, LLC v. Harford Mut. Ins. Co.*, Civ. No. 21-15929, 2023 WL 5447279, at *2 (D.N.J. Aug. 24, 2023) (citation omitted); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) ("Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit.").

The rule "has 'a liberal policy of admissibility.'" *Jefferson v. Lias*, Civ. No. 15-1086, 2022 WL 4550144, at *7 (D.N.J. Sept. 28, 2022) (quoting *Pineda*, 520 F.3d at 243). The result is that "the 'rejection of expert testimony is the exception and not the rule.'" *Id.* (quoting Fed. R. Evid. 702, advisory committee's note to 2000 Amendment); *see also Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 546 F. Supp. 2d 155, 166 (D.N.J. 2008) ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." (quoting *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996))). "If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Failla v. George's Foods, LLC*, Civ. No. 22-07109, 2023 WL 7298473, at *4 (D.N.J. Nov. 6, 2023) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997), *as amended* (Dec. 12, 1997)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of

proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

To be reliable, an "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (*Daubert*, 509 U.S. at 590). The expert must also "have 'good grounds' for his or her belief." *Id.* The focus "is on the expert's principles and methodology, not on his conclusions." *Equinox Properties, LLC*, 2023 WL 5447279, at *3. The reliability inquiry examines the following factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.
>
> [*Freedom Mortg. Corp. v. LoanCare, LLC*, Civ. No. 16-02569, 2023 WL 2570201, at *3 (D.N.J. Mar. 20, 2023) (quoting *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003)).]

The inquiry is "flexible," and "the Court is not restricted to any 'definitive checklist or test.'" *Id.* (quoting *Daubert*, 509 U.S. at 593). Indeed, "[m]any factors of the *Daubert* reliability test are not applicable when a non-scientific expert's methodology is being scrutinized." *Equinox Properties, LLC*, 2023 WL 5447279, at *4. In some cases, "the expert's training and experience will provide an adequate and reliable foundation to admit an opinion for consideration by a jury." *Id.* (citing *W. Am. Ins. Co. v. Jersey Cent. Power & Light Co.*, Civ. No. 03-6161, 2008 WL 5244232, at *8 (D.N.J. Dec. 15, 2008)).

Here, Mr. Schuller is a registered professional engineer in the States of Colorado, New Jersey, and New York. (ECF No. 87-2 at 1.) He holds degrees in engineering from the University

of Colorado and is president of "a consulting engineering firm specialized in evaluation and strengthening of masonry materials and structures." (*Id.*) Mr. Schuller taught courses in masonry structural design at the University of Colorado from 2000 to 2008, has over 100 publications relating to concrete and masonry structures, and is a fellow of the Masonry Society and the Association for Preservation Technology." (*Id.*)

Mr. Schuller produced an expert report, dated June 21, 2021, which "addresses workmanship and construction tolerances for concrete masonry construction at the" maintenance and administrative buildings initially constructed by Colorado Custom. (ECF No. 80-2 at 2.) Because the initial masonry walls were demolished, Mr. Schuller explains that he "was unable to visit the site to take measurements . . . or form an opinion of workmanship based on firsthand knowledge." (*Id.* at 3.) His opinions were therefore "based on . . . review of project documents, photographs taken by others, and measurements made by others under the direction of G&C Fabcon." (*Id.*) In particular, the Farnsworth Group, Inc., "recorded as-built conditions using a 3-D laser scan survey of masonry walls at the [m]aintenance [b]uilding," and Mr. Schuller calls into question the methodology and results of that survey. (*Id.* at 12-17.)

Mr. Schuller notes in his report that he is accustomed to "working with laser survey results" and has "been involved in approximately 15 projects using results of laser scan surveys." (*Id.* at 17.) Generally, Mr. Schuller believes he has worked with "laser scan point clouds much more often than a typical engineer." (*Id.*) Based on his review of Farnsworth's data, Mr. Schuller opines that the "point cloud data is imprecise and shows significant scatter, putting the validity of the entire data set in question." (*Id.* at 17-18.) Looking at the data for the north wall of the maintenance building, Mr. Schuller's opinion is that it "does not properly represent the wall surface" and, as a result, "it is not possible to determine if th[e] wall profile meets project tolerance specifications within a reasonable degree of engineering certainty." (*Id.* at 18.) Mr. Schuller

believes that "[f]ollowing th[e] same process" as G&C's expert, "it is possible to show that th[e] wall is nearly perfectly plumb . . . or out of plumb." (*Id.*) Mr. Schuller also offers his view that "[s]ome or all of the observed wall deviation from plumb could be caused by actions occurring during or after construction," including "wind loads, thermal heating, or impact loads." (*Id.* at 25.) He ultimately argues that "[t]he decision to demolish in-place construction was based on incomplete data, and a faulty premise that conditions at the top of the wall accurately represented variations in wall position over the height of the wall." (*Id.* at 30.)

In seeking to exclude Mr. Schuller's expert testimony, Defendants advance several arguments targeted at his reliability. *First*, they fault Mr. Schuller for not explicitly stating in his report that all his opinions were reached "within a reasonable degree of engineering certainty." (ECF No. 80-1 at 10.) The cases Defendants cite do not support the automatic exclusion of Mr. Schuller's testimony, however. In those cases, the experts made affirmative representations during depositions that indicated that their opinions were purely speculative, which is not the case here.[12] Moreover, when examining an expert report, "the Court is concerned with substance, not form." *In re Urethane Antitrust Litig.*, 152 F. Supp. 3d 357, 361 (D.N.J. 2016). And experts are typically not required to use "magic words . . . to save themselves from *Daubert* exclusion." *Id.* (quoting *TVIIM, LLC v. McAfee, Inc.*, Civ. No. 13-04545, 2015 WL 4148354, at *3 (N.D. Cal. July 9, 2015)).

---

[12]    In *Ucciardi v. E.I. Du Pont Nemours & Co.*, for example, which involved a flood and damage to homes, the district court on summary judgment found that the plaintiff's expert lacked the proper factual foundation to render an admissible opinion on causation where the expert repeatedly admitted that he did not know when the water reached a certain level or when the homes were flooded and how the two interrelated. Civ. No. 13-4952, 2016 WL 7338533, at *5 (D.N.J. Dec. 19, 2016). Similarly, in *Hanover Am Ins Co v. Glenc Entrp*, the defendant's experts were found not to have offered admissible opinions on the spread of a fire where deposition testimony exposed that they were merely speculating and had based their opinions "almost singularly on the deposition testimony of one witness." 2018 Colo. Dist. LEXIS 4448, *11-13 (Nov. 26, 2018).

*Second*, Defendants fault Mr. Schuller for not inspecting the buildings personally and, instead, relying on the data collected by Farnsworth. (ECF No. 80-1 at 10-11.) Defendants also note that Mr. Schuller acknowledged that in the absence of physical evidence he was unable to "fully understand" the masonry construction on the maintenance and administration buildings. (*Id.*) The inability of Mr. Schuller to physically inspect the buildings is largely a function of the fact that they were demolished, and to the degree Defendants want to try to impeach Mr. Schuller's testimony based on his prior statements about the need to observe the actual buildings, they are welcome to do so at trial. Ultimately, the Court sees no valid reason why Mr. Schuller should not be permitted to offer his expert opinion as to what he believes the data collected from the buildings shows or does not show as to their masonry construction.

*Third*, Defendants point to deposition testimony that suggests that Mr. Schuller has not performed a cloud point survey himself and is not familiar with the specific software used by Farnsworth. (*Id.* at 11-12.) Even so, Mr. Schuller apparently has extensive experience working with laser survey results performed by others, and whether Mr. Schuller's experience should be discounted when he opines on Farnsworth's cloud point data specifically goes to the credibility of his opinions, not the reliability of his methods.

*Fourth,* Defendants accuse Mr. Schuller of taking "a small sample of Farnswoth's data" and "opt[ing] to 'exaggerate' it" to "inflat[e] . . . the appearance of range noise within the scan data." (*Id.* at 13-15.) They also accuse him of "expanding the construction tolerance envelope" and misstating the amount of scatter in the data. (*Id.* at 16-17.) These criticisms center on a difference of opinion between the parties' experts as to how to interpret the cloud point data. The Court's view is that this dispute should go to "a finder of fact to evaluate these competing [approaches], rather than preclude certain testimony *in limine*." *NN&R, Inc. v. One Beacon Ins. Grp.*, Civ. No. 03-5011, 2006 WL 1765077, at *10 n.20 (D.N.J. June 26, 2006). At

this point, the parties do not need "to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct,* they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *In re Paoli R.R.*, 35 F.3d at 744 (emphasis in original).

*Fifth*, and finally, Defendants argue that Mr. Schuller's opinion that demolition of the walls was wasteful is purely speculative and that Mr. Schuller ignored critical facts when rendering his opinions. (ECF No. 80-1 at 17-20.) To the extent that Mr. Schuller's expert conclusion is that the walls were not constructed out of plumb, it naturally follows that his opinion would also be that it was unnecessary to demolish them or that there were alternatives that could have been explored. And if Defendants believe that Mr. Schuller's opinions are vulnerable because of how he approached the facts and evidence in the case, they may raise that issue at trial. This goes to the weight of his testimony, and Defendants have not demonstrated that this rendered his methodology unreliable. Again, the grounds for an expert opinion "do not have to be perfect." *In re Paoli R.R.*, 35 F.3d at 744. Experts may testify at trial "even if the judge thinks that a . . . methodology has some flaws such that if they had been corrected, the [expert] would have reached a different result." *Id.*

All in all, the Court finds that Mr. Schuller is qualified and his methods are sufficiently reliable within the meaning of Federal Rule of Evidence 702 to permit his expert testimony at trial. Accordingly, Defendants' *Daubert* motion is denied.

## IV.   CONCLUSION & ORDER

For the reasons set forth above, and other good cause shown, **IT IS** on this 14th day of February, 2024, **ORDERED** as follows:

1.   Defendants' motion to preclude the fact testimony of non-party Caleb Bauserman (ECF No. 76) is **DENIED**.

2.   Defendants' motion for an adverse jury instruction (ECF No. 78) is **DENIED**.

3.   Plaintiff's motion to exclude evidence of damages for G&C's breach of contract counterclaim (ECF No. 79) is **GRANTED** in part and **DENIED** in part. Specifically, the damages testimony from the fourteen representatives of various subcontractors allegedly retained by G&C to remedy the defects in Colorado Custom's work is **EXCLUDED**.

4.   Defendants' motion to preclude the trial testimony of Plaintiff's expert Michael Schuller (ECF No. 80) is **DENIED**.

5.   The Clerk is directed to **TERMINATE** the motions pending at ECF Nos. 76, 78, 79, and 80.

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE